## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BRAD RISCHER,** | \| |
| | \| |
| **Plaintiff,** | \| |
| | \| |
| **v.** | \|   **Case No. 13-CV-4045-DDC** |
| | \| |
| **CAROLYN W. COLVIN,** | \| |
| **Acting Commissioner of Social** | \| |
| **Security Administration,** | \| |
| | \| |
| **Defendant.** | \| |
| _____ | \| |

### MEMORANDUM AND ORDER

Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of the

Commissioner of Social Security Administration ("Commissioner") denying his application for

disability insurance benefits under Title II of the Social Security Act, as amended.  Plaintiff has

filed a brief (Doc. 17) seeking judicial review of the Commissioner's decision.  The Commis-

sioner has filed a brief in opposition (Doc. 24) and submitted the administrative record with her

Answer (Doc. 12).  Upon the filing of Plaintiff's reply brief (Doc. 25), this matter became ripe

for determination.  Having reviewed the administrative record and the briefs of the parties, the

Court reverses the decision of the Commissioner and remands the case for further proceedings

consistent with this order.

### I.  BACKGROUND[1]

Plaintiff was born in 1964 and has some college education.[2]  He applied for disability

---

[1]The background information comes from the certified transcript of the record ("Tr.") provided with the
Commissioner's Answer.

[2]*See* Tr. at 149 (showing birth year), 176 (showing three years of college).  One psychiatric record indicates
that he "finished high school and had one year junior college."  Tr. at 445.  Plaintiff also testified that he was six to
eight hours short of a college degree.  Tr. at 55.

insurance benefits on April 12, 2010, claiming an inability to work due to his disabling condition beginning May 15, 2009.[3]  He identified three mental conditions that limit his ability to work: (1) bipolar disorder, (2) depression, and (3) attention deficit disorder ("ADD").[4]  During the fifteen years before the alleged onset of disability, he worked as a disability aide, laboratory technician, caregiver, library assistant, life skill coach, and clerk.[5]

After the Social Security Administration denied his application initially and on reconsideration,[6] he requested a hearing before an Administrative Law Judge ("ALJ").[7]  On October 27, 2011, the ALJ conducted a hearing at which plaintiff appeared personally and through counsel.[8] The ALJ also heard testimony from plaintiff's wife and a vocational expert ("VE").[9]  The VE testified that a hypothetical person with limitations described by the ALJ would not be capable of performing any of plaintiff's former jobs.[10]  With respect to the ALJ's first set of described limitations, the VE further testified that jobs existed in significant numbers in the national and

---

[3]Tr. at 149.

[4]Tr. at 175.

[5]Tr. at 56-59 (testimony of plaintiff), 79-80 (testimony of plaintiff and vocational expert).

[6]Tr. at 86-87.

[7]Tr. at 104.

[8]*See* Tr. at 48-85.

[9]*See* Tr. at 71-84.

[10]Tr. at 80-81 (describing the following limitations:  (1) able to do simple, routine repetitive tasks but limited to jobs that do not demand attention to details or complicated job tasks or instructions; (2) able to work near others but limited to jobs that do not require close cooperation and interaction with co-workers and would work better in relative isolation; (3) limited to only occasional cooperation and interaction with general public; (4) able to maintain attention and concentration for two-hour periods of time; and (5) able to adapt to changes in the workplace and accept supervision at a basic level).

local economies that such hypothetical person could perform.[11]  When the ALJ included more

severe limitations to his hypothetical person, the VE could identify no jobs for such person.[12]

On December 22, 2011, the ALJ issued a written decision finding plaintiff not disabled.[13]

On March 5, 2013, the Appeals Council accepted additional evidence but found no reason to

review the ALJ's decision and denied plaintiff's request for review.[14]  Consequently, the ALJ's

decision is the final decision of the Commissioner.[15]  Plaintiff appealed the decision to this Court

pursuant to 42 U.S.C. § 405(g) on April 22, 2013.

## II.  MEDICAL HISTORY[16]

The administrative record contains (1) hospital records from Osawatomie State Hospital

(Ex. 16F) and Lawrence Memorial Hospital (Exs. 8F and 9F); (2) inpatient treatment records

from Stormont-Vail Regional Health Center (Ex. 9F); (3) treatment records from Ronald G.

Graham, D.O., (Exs. 2F and 18F), Jeff Nichols, M.D., (Exs. 20E, 13F, 14F, 15F, and 17F), and

licensed clinical social worker Ed Bloch (Exs. 1F, 10F, and 11F); (4) a state agency consultative

examination by Stanley I. Mintz, Ph.D., (Ex. 4F); (5) two reports of a second state agency

consultant, Lauren Cohen, Ph.D., (Exs. 6F and 7F) following her review of the medical record;

and (6) a case analysis of Norman S. Jessop, Ph.D., (Ex. 12F) following his review of the record

---

[11]Tr. at 81.

[12]Tr. at 82 (describing the following limitations:  (1) limited to jobs that consist of routine repetitive tasks; (2) inability to cooperate or interact with co-workers or the general public; (3) inability to accept supervision or adapt to workplace changes; and (4) inability to maintain an accepted level of punctuality and attendance).

[13]Tr. at 32-42.

[14]Tr. at 1, 4.

[15]Tr. at 1; *Threet v. Barnhart*, 353 F.3d 1185, 1187 (10th Cir. 2003).

[16]Because Plaintiff's physical health is not in dispute, there is no need to recite medical records unrelated to his mental impairments.

on reconsideration.  To the extent practical, the following sections review these records in chronological order.

### A.  <u>Osawatomie State Hospital</u>

The staff of Osawatomie State Hospital diagnosed plaintiff with a depressive disorder following his admission for self-inflicted superficial lacerations to his forearms in June 2006.[17] A bipolar diagnosis noted in plaintiff's medical history remained unconfirmed because plaintiff was under the influence of multiple drugs and alcohol.[18]

### B.  <u>Dr. Graham</u>

Dr. Graham treated plaintiff from April 2008 through May 2010,[19] resulting in various impressions including ADD, bipolar, and depression.[20]  While his records about plaintiff's mental impairments are mostly unremarkable or illegible, Dr. Graham noted medication problems in 2008 and plaintiff's medications were one of his chief complaints on May 5, 2010.[21]  And, on that date, Dr. Graham noted:  "No particular reason why depression seems to be getting worse."[22]

### C.  <u>Social Worker Bloch – First Treating Period</u>

From March 27, 2009, through April 30, 2010, plaintiff met with licensed clinical social worker Ed Bloch about his mental impairments.[23]  Bloch noted diagnoses of depressive, bipolar,

---

[17]Tr. at 443-48.

[18]Tr. at 447.

[19]*See* Tr. at 302-31.

[20]*See* Tr. at 302, 304, 307, 311, 313, 315, 319.

[21]See Tr. at 302, 311, 315.

[22]*See* Tr. at 302.

[23]*See* Tr. at 293-99.

and personality disorders.[24]  Unlike the handwritten and sometimes illegible notes of Dr.

Graham, the typed notes of Bloch identify plaintiff's (1) chief complaints (suicide ideation;

severe depression and labile mood; episodic anxiety, manic behavior, poor judgment, and suici-

dal thinking; and chronic sleep disturbance and suspected organicity); (2) diagnoses, including

GAF scores;[25] (3) severe symptoms (depressed mood, excessive distractibility, feelings of hope-

lessness, impaired concentration, poor judgment manifested by reckless behavior that could lead

to self injury, suicidal thinking, impulsivity, and instability of mood); (4) moderate symptoms

(intermixed manic and depressive episodes, obsessive rumination, racing thoughts, inadequate

coping skills and response to demands of living, and temper outbursts); (5) severe impairments

in functioning (inability to work, diminished concentration at work, difficulty maintaining

employment, and dangerous risk-taking behavior); and (6) moderate impairments in functioning

(poor judgment in social situations and distance and argumentativeness with people).[26]  Bloch

---

[24]*See* Tr. at 293, 295, 297, 299.

[25]"GAF" stands for "Global Assessment of Functioning."  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 (10th Cir. 2012).  "The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning."  *Id.* at 1162 n.1.  At intake, Bloch noted a GAF score of 44, which had improved to 52 when he discharged plaintiff on May 5, 2010.  *See* Tr. at 293, 299.  A GAF score of 41 to 50 refelcts "[s]erious symptoms" or "any serious impairment in social, occu-pational, or school functioning."  *Keyes-Zachary*, 695 F.3d at 1162 n.1 (quoting American Psychiatric Ass'n, Diag-nostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000) ["DSM-IV-TR"]).  A score of 51 to 60 indicates "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.* (same).

The current version of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders "DSM-5" (5th ed. 2013) no longer endorses use of a GAF score and recognizes that the score was discon-tinued for several reasons, "including its lack of clarity (i.e., including symptoms, suicide risk, and disabilities in descriptors) and questionable psychometrics in routine practice."  *See Martinez v. Colvin*, No. 13-CV-00985-MEJ, 2014 WL 2967600, at *3 n.4 (N.D. Cal. July 1, 2014); *accord Krchmar v. Colvin*, 548 F. App'x 531, 534 n.2 (10th Cir. 2013); *Williams v. Colvin*, ___ F.3d ___, ___, No. 13-3607, 2014 WL 2964078, at *2 (7th Cir. July 2, 2014). GAF scores remain germane to this case, however, because the medical and administrative records include references to them.

[26]Tr. at 293-99.

5

discharged plaintiff because he had achieved "crisis stabilization" with some improvement in symptom reduction following "27 psychotherapy sessions and 50 neuro trainings."[27]

## D.  **State Agency Consultants**

On July 24, 2010, Dr. Mintz, a state agency consultant, examined plaintiff's mental status.[28]  Plaintiff reported that medications and brain training had been "helpful to him."[29]  Dr. Mintz assessed plaintiff's GAF at 50, with a high mark of 55 in the previous year, and diagnosed a bipolar disorder, ADD, and continuing substance abuse.[30]  Plaintiff exhibited symptoms of those disorders, "with considerable depression."[31]  Dr. Mintz opined that plaintiff "may have difficulty relating well to co-workers and supervisors," but "appears able to understand simple and intermediate instructions."[32]

On August 18, 2010, Dr. Cohen – a nonexamining, nontreating consultant – completed two standard forms to evaluate plaintiff's mental health:  a "Psychiatric Review Technique" ("PRT") and a "Mental Residual Functional Capacity Assessment" ("MRFCA").[33]  She found plaintiff was suffering from ADD (Listing 12.02),[34] bipolar syndrome (Listing 12.04), and

---

[27]Tr. at 299.

[28]*See* Tr. at 341-44.

[29]Tr. at 341.

[30]Tr. at 344.

[31]Tr. at 343.

[32]Tr. at 342.

[33]*See* Tr. at 350-69.

[34]Listing numbers generally become relevant when an ALJ determines whether a claimant's impairments meet all medical criteria for a particular listing.  *See Birkinshaw v. Astrue*, 490 F. Supp. 2d 1136, 1143 (D. Kan. 2007).

substance abuse (Listing 12.09).[35]  But Dr. Cohen specifically noted that the latter impairment

"does not appear relevant."[36]  She found that the other impairments did not satisfy the "B"

criteria for their listings because plaintiff had not experienced any episodes of decompensation

of extended duration and his impairments merely imposed a moderate restriction of activities of

daily living and moderate difficulties maintaining social functioning and concentration, persist-

ence, or pace.[37]  She also found that the evidence did not "establish the presence of the 'C'

criteria" for either listing.[38]

In a case analysis dated January 6, 2011, Dr. Jessop affirmed Dr. Cohen's PRT and

---

[35]Tr. at 351, 353, 358.

[36]Tr. at 358, 362.

[37]Tr. at 360.  Listings 12.02 (Organic Mental Disorders) and 12.04 (Affective Disorders) have the same "B" criteria.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02(B), 12.04(B).  For both listings, the "B" criteria require the claimant's impairments to result in two or more of the following:
    1.  Marked restriction of activities of daily living; or
    2.  Marked difficulties in maintaining social functioning; or
    3.  Marked difficulties in maintaining concentration, persistence, or pace; or
    4.  Repeated episodes of decompensation, each of extended duration.
*Id.*

[38]Tr. at 360-61.  Except for the type of disorder required, *i.e.*, chronic mental disorder versus a chronic affective disorder, the "C" criteria for these listings have identical requirements:
    [m]edically documented history of a [chronic organic mental disorder or affective disorder] of at
    least 2 years' duration that has caused more than a minimal limitation of ability to do basic work
    activities, with symptoms or signs currently attenuated by medication or psychosocial support, and
    one of the following:
        1.  Repeated episodes of decompensation, each of extended duration; or
        2.  A residual disease process that has resulted in such marginal adjustment that
        even a minimal increase in mental demands or change in the environment would
        be predicted to cause the individual to decompensate; or
        3.  Current history of 1 or more years' inability to function outside a highly
        supportive living arrangement, with an indication of continued need for such an
        arrangement.
20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02(C), 12.04(C).  And, as used in the listings, "[t]he term repeated episodes of decompensation, each of extended duration . . . means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).  If a claimant has "experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, [the Commissioner] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence."  *Id.*

MRFCA on reconsideration.[39]  In doing so, Dr. Jessop acknowledged that plaintiff was hospital-

ized in August 2010 after an attempted suicide.[40]  But he stated that "[s]ubsequent progress notes

indicate essential compliance and an acceptable degree of stability."[41]

### E.  Lawrence Memorial Hospital and Stormont-Vail

On August 20, 2010, two days after Dr. Cohen recorded her written opinions, Lawrence

Memorial Hospital admitted plaintiff following an attempted suicide by drug ingestion.[42]  In an

initial assessment, a hospital social worker stated that plaintiff:  (1) has "[t]otal independence"

with respect to his activities of daily living, (2) is able to do his essential shopping independ-

ently, and (3) is independent in the home.[43]  Nevertheless, the social worker expressed concern

about plaintiff's financial abilities, interpersonal relationships, coping difficulties, self-concept,

lack of involvement, adjustment to loss, and decision-making.[44]  Moreover, a nurse noted

"[g]rossly impaired" judgment and impaired insight.[45]  The attending physician, Lisa Gard,

M.D., noted that plaintiff was alert without acute distress, but had a flat mood and affect with ab-

normal, psychotic thoughts, *i.e.*, suicidal thoughts.[46]  Dr. Gard counseled plaintiff and his family

---

[39]Tr. at 426.

[40]*Id.*

[41]*Id.*

[42]Tr. at 370-73.

[43]Tr. at 397.

[44]*Id.*

[45]*Id.*

[46]Tr. at 374, 391.

about the diagnosis and diagnostic results.[47]  Hospital staff transferred him to Stormont-Vail

West Adult Unit by secured transport.[48]

During intake at Stormont-Vail, plaintiff's symptoms included sleep problems, hopeless-

ness, decreased behavioral control, and mood fluctuation.[49]  Based upon the medical evaluation

of Dr. Gard, staff rated plaintiff as medically stable.[50]  A mental status exam conducted the next

day revealed depressed mood and constricted affect, among other findings.[51]  Plaintiff denied any

current suicidal ideation, but did not feel he could be safe outside the hospital.[52]  Notably, staff

recorded "20" in Axis V of the five-part diagnostic impression.[53]  The next day, plaintiff was

sleeping and eating well; denied medicinal side effects, suicidal ideation, and violent thoughts;

had normal and logical thought processes, euthymic mood, grossly intact judgment, and good

insight, attention, and concentration.[54]  In addition, the record reflects that plaintiff wrote a

positive note about his feelings.[55]  He felt safe in the hospital and wanted to stay another day.[56]

---

[47]Tr. at 376.

[48]Tr. at 377, 383.

[49]Tr. at 388.

[50]*Id.*

[51]Tr. at 399.  Much of this record is illegible or indecipherable.

[52]Tr. at 383, 399.

[53]Tr. at 399.  Axis V usually includes the GAF score.  A GAF score of 20 represents:  "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012) (quoting DSM-IV-TR).

[54]Tr. at 400.

[55]*Id.*

[56]*Id.*

After Stormont-Vail discharged plaintiff on August 23, 2010, Darryl Kabins, M.D., completed a discharge summary listing diagnoses of a mood disorder, a generalized anxiety disorder, and a GAF score of 50 on discharge.[57]  The discharge plan included resuming treatment with Bloch the next day and prescribing three mental health medications – Effexor twice per day as an antidepressant; Seroquel four times per day as needed for anxiety, to clear thinking, or reduce agitation; and Desyrel at bedtime as a sedative, antidepressant, and pain reliever.[58]

### F.  Social Worker Bloch – Second Treating Period

Plaintiff resumed treatment with his social worker, Mr. Bloch, by participating in six psychotherapy sessions and five brain training sessions through October 6, 2010.[59]  Bloch added the hospitalization for suicidal ideation to the chief complaints that plaintiff previously had presented and noted the same symptoms and impairments in functioning.[60]  Bloch also noted a major depressive disorder diagnosis and initially assigned a GAF score of 50, which increased to 52 on October 4, 2010.[61]

Plaintiff continued to see Bloch through December 2010, but his records of this treatment are remarkable only as follows.  On October 16, 2010, Bloch noted that plaintiff had been "compliant with treatment" but was still a mild suicide risk, "guarded in display of affect," and "very passive and quiet in sessions."[62]  The next week, Bloch noted:  "Suicidal ideation continues post

---

[57]Tr. at 383.

[58]Tr. at 384-85.

[59]*See* Tr. at 406, 412.

[60]Tr. at 406-11, 425.

[61]Tr. at 406, 409, 411, 425.

[62]Tr. at 423.

hospitalization."[63]  On November 2, 2010, plaintiff reported reduced suicidal ideation, "feeling less depressed," and more himself after session, but still represented a mild suicide risk.[64]  Three days later, his suicide risk remained the same, although he "continue[d] to report improvement, less depression, [and] better energy."[65]  On November 16, 2010, plaintiff reported "feeling very lethargic" and agitated, which may have related to a new medication to help stop smoking.[66]  Plaintiff felt better after the session.[67]  Four days later, plaintiff reported feeling "back to normal" since resuming brain training in October, but his risk of suicide remained unchanged and he remained at high risk generally given his chronic relapses when under stress.[68]  By November 29, 2010, plaintiff remained a mild suicide risk and a high risk generally due to his chronic relapses, but he appeared "stable with current regimen of therapy and brain training."[69]  On December 4, 2010, Bloch continued to note that plaintiff remained a mild suicide risk and a high risk generally due to his chronic relapses.[70]

## G.  Dr. Nichols

Dr. Nichols began treating plaintiff for his mental condition on October 5, 2010.[71]  His

---

[63]Tr. at 422.

[64]Tr. at 421.

[65]Tr. at 420.

[66]Tr. at 419.

[67]*Id.*

[68]Tr. at 418.

[69]Tr. at 417.

[70]Tr. at 416.

[71]Tr. at 436.

records reflect treatment from October 2010 through March 2012.[72]  He prescribed Effexor for depression and Adderall for ADD.[73]  In October 2010, plaintiff was also taking Seroquel.[74]  On December 6, 2010, plaintiff "fe[lt] better" and had "no need for Seroquel," but two weeks later, Dr. Nichols increased the dosage of Adderall at plaintiff's request.[75]

On March 3, 2011, plaintiff reported to Dr. Nichols that he was "doing great" and was "at the top of [his] game."[76]  But, on April 5, 2011, plaintiff reported that he had attempted suicide two days earlier by ingesting excessive Seroquel and Effexor and by cutting his wrist superficially.[77]  He had stopped taking his Adderall about seven days before the attempt.[78]  Despite the suicide attempt, plaintiff was "surprisingly good" at the appointment.[79]  Later that month, plaintiff was not having "suicidal thoughts."[80]  The next month, plaintiff was "[d]oing pretty well" with daily medication and Effexor was "working good."[81]  In June 2011, plaintiff was "[d]oing fantastic," his concentration and temper were better, and he was sleeping good.[82]  The next month, Dr. Nichols again noted that plaintiff was doing fantastic and that it was the "Best

---

[72]Tr. at 277-78, 427-35, 449-56.

[73]Tr. at 280, 427-35.

[74]Tr. at 430-35.

[75]Tr. at 429.

[76]Tr. at 429.

[77]Tr. at 428.

[78]*Id.*

[79]*Id.*

[80]Tr. at 427.

[81]*Id.*

[82]Tr. at 277.

summer [plaintiff] ever remembered."[83]

By September 14, 2011, plaintiff had stopped taking Effexor and Adderall because Effexor "ceased to 'do good.'"[84]  Plaintiff complained of "night sweating" and "bad body odor" and was "[d]etermined to go off meds."[85]  He was considering taking EMPowerplus.[86]  Dr. Nichols cautioned him to be careful and to resume his medications if he feels worse or if his wife noticed deterioration.[87]  Two weeks later, Dr. Nichols noted that plaintiff had been taking EMPower and the doctor prescribed Xanax.[88]  On October 19, 2011, plaintiff was continuing to take EMPower and Xanax but said he had felt himself "being pulled down" the past week and was having some short-term concentration problems.[89]  The doctor noted:  "Getting disability big hassle."[90]  Dr. Nichols completed a "Mental Residual Functional Capacity Questionnaire" and a "Physician's Questionnaire" about "Listing 12.04."[91]

On the first form, Dr. Nichols noted three diagnoses – ADD (Code No. 314.01), major depressive disorder (Code No. 296.33), and a generalized anxiety disorder (Code No. 300.02) –

---

[83]*Id.*

[84]Tr. at 456.

[85]*Id.*

[86]*Id.*

[87]*Id.*

[88]Tr. at 455.

[89]Tr. at 454.

[90]*Id.*

[91]*See* Tr. at 436-42.

which resulted from his DSM-IV multiaxial evaluation.[92]  He also assessed plaintiff's "current GAF" as 35, with a range of 30 to 40.[93]  He noted that plaintiff was taking Xanax currently, had taken Effexor and Adderall during the past year, and "[m]edication has been of limited useful-ness and has had side effects," such as memory impairment and jitteriness.[94]  He identified plain-tiff's symptoms as "Depression, anxiety, irritability, [and] difficulty concentrating."[95]  To demonstrate the severity of plaintiff's mental impairments and symptoms, Dr. Nichols stated that plaintiff is anxious, has difficulty maintaining a conversation, and has attempted suicide.[96]  The doctor opined that plaintiff "would require considerable support and probably still be unable to work."[97]  He also opined that plaintiff was unable to sustain a 40-hour work week due to the severity of his symptoms.[98]

Based upon the Physician's Questionnaire, Dr. Nichols opined that plaintiff's condition meets or equals Listing 12.04 because:  (A) there is medically documented persistence of a depressive syndrome characterized by all of the listed symptoms except hallucinations, delusions, and paranoid thinking and (B) plaintiff's disorder results in (1) marked difficulties in

---

[92]Tr. at 436.

[93]*Id.*  A GAF score of 31 to 40 indicates:  (1) "[s]ome impairment in reality testing or communication" or (2) "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012) (quoting DSM-IV-TR).  A score of 21 to 30 denotes:  "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communica-tion or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  *Id.* (same).

[94]Tr. at 436.

[95]*Id.*

[96]*Id.*

[97]Tr. at 437.

[98]Tr. at 438.

maintaining social functioning; (2) marked difficulties in maintaining concentration, persistence, or pace; and (3) the required episodes of decompensation.[99]  The doctor also opined that the condition satisfies Listing 12.04(C), given plaintiff's documented history of a chronic affective disorder; repeated episodes of decompensation; and current history of an "inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."[100]  With respect to Listing 12.04(C), Dr. Nichols noted that plaintiff "exceeds these conditions" and is "[c]learly unable to work."[101]

By November 2011, plaintiff had stopped using Xanax because he was "eating too much" and had decreased his use of EMPower.[102]  Dr. Nichols prescribed Wellbutrin, which had "work-ed in past."[103]  Two weeks later, he increased Wellbutrin because plaintiff "has been depres-sed."[104]  In December 2011, plaintiff was "still very sedentary" and could not stay focused even reading.[105]  Dr. Nichols also noted that decreasing Wellbutrin would be better and that plaintiff "believes Adderall may help again."[106]

By January 4, 2012, plaintiff had stopped taking Wellbutrin but had resumed brain train-

---

[99]Tr. at 440-41.

[100]Tr. at 441.

[101]*Id.*

[102]Tr. at 453.

[103]*Id.*

[104]Tr. at 452.

[105]Tr. at 451.

[106]*Id.*

ing.[107]  He was "[d]oing well [with] meds."[108]  He was doing "pretty well" the next month but

had put brain training on hold due to financial reasons.[109]  Dr. Nichols noted that Effexor had

been effective previously but plaintiff had experienced night sweats in 2011.[110]  He prescribed

Cymbalta, which was "working great" as of March 7, 2012.[111]

### III.  SUMMARY OF ALJ FINDINGS

The ALJ found that plaintiff has not engaged in substantial gainful activity since the

alleged onset of his disability and that he suffers from four impairments that "are severe, in

combination if not singly":  (1) bipolar disorder, (2) personality disorder, (3) attention-deficit or

hyperactivity disorder, and (4) substance abuse disorder.[112]  But the ALJ did not find that

plaintiff suffers from any impairment or combination of impairments that meets or medically

equals any listed impairment that would qualify him as presumptively disabled without regard to

his residual functional capacity ("RFC").[113]

The ALJ then determined that plaintiff has the RFC to perform work at all exertional

levels with only the following nonexertional limitations:  (1) while he is able to perform simple,

routine, and repetitive tasks, he cannot do jobs that "demand attention to details or complicated

tasks or instructions"; (2) while he is able to work in proximity to others, he cannot perform jobs

---

[107]Tr. at 450.

[108]*Id.*

[109]*Id.*

[110]*Id.*

[111]Tr. at 449-50.

[112]Tr. at 34.

[113]Tr. at 34-35.

requiring "close cooperation and interaction with coworkers and would work best in relative isolation"; (3) his impairments preclude jobs requiring more than "occasional interaction and cooperation with general public"; and (4) he has the ability to maintain attention and concentration for a minimum of two hours at a time, and at a basic level, he can adapt to changes in the workplace and accept supervision.[114]  The ALJ found that the medical findings do not support finding any more severe limitations.[115]

The ALJ recognized the August 2010 suicide attempt and visit to Lawrence Memorial Hospital.[116]  He noted that, that the treating physician, Dr. Gard, had completed an initial assessment which stated, among other things, various psychosocial concerns and that plaintiff was completely independent with regards to his activities of daily living.[117]  The ALJ also noted that later, unspecified progress notes indicated compliance with treatment and an acceptable degree of stability.[118]  And, finally, the ALJ recognized that plaintiff was reporting improvement, less depression, better energy, feeling a greater sense of stability, and "feeling back to normal."[119]

The ALJ gave "great weight" to Dr. Cohen's opinions because she "had the opportunity to review the claimant's entire file in making her assessments."[120]  And the ALJ accorded "significant weight" to the opinions of another state agency consultant, Dr. Mintz, because his

---

[114]Tr. at 36.

[115]Tr. at 37.

[116]*Id.*

[117]*Id.*  As discussed later, a social worker actually completed this initial assessment.  *See* Tr. at 397.

[118]Tr. at 37.  Although not identified by the ALJ, the progress notes appear to be the October 16, 2010, to December 4, 2010, progress notes of Bloch.  *See* Tr. at 416-24 (within Ex. 11F).

[119]Tr. at 37.

[120]*Id.*

"opinions are generally consistent with the record as a whole, and are supported by medically acceptable clinical techniques/testing."[121]  The ALJ specifically found the GAF score of 50 assessed by Dr. Mintz consistent with the score assessed at Stormont-Vail and by Bloch.[122]  But the ALJ does not otherwise specify which opinions were or were not consistent with Dr. Mintz' opinions.[123]  Nor does the ALJ identify any clinical techniques or testing other than the GAF.[124]

The ALJ specifically gave the opinions of Bloch "little weight" because Bloch is merely a licensed clinical social worker who does not qualify as an acceptable medical source but instead qualifies as an "other source" that "might help in understanding how an impairment affects an individual's ability to work."[125]  The ALJ also noted:  "Most importantly, opinions as to disability are reserved for the Commissioner."[126]

While considering opinions of Dr. Nichols, the ALJ again noted that opinions of disability are matters reserved to the Commissioner.[127]  The ALJ, nevertheless, accorded the doctor's opinions "some weight" to the extent they support finding that plaintiff has non-exertional limitations.[128]  But otherwise, the ALJ gave "little weight" to Dr. Nichols' opinions on grounds that his contemporaneous treatment notes do not assign a GAF score, contain very little

---

[121]Tr. at 38.

[122]*Id.*

[123]*See id.*

[124]*See id.*

[125]Tr. at 37.

[126]*Id.*

[127]Tr. at 38-29.

[128]Tr. at 39.

information about plaintiff's condition or progress, and were inconsistent with unidentified statements made in his completed questionnaire.[129]

Given his determined RFC, the ALJ found that plaintiff could not perform his past relevant work.[130]  But considering plaintiff's age, education, work experience, and RFC, the ALJ identified jobs existing in significant numbers in the national economy that plaintiff could perform based upon testimony from the vocational expert.[131]  Accordingly, the ALJ found plaintiff not disabled.[132]

## IV.  LEGAL STANDARDS

### A.  Standard of Review

Section 405(g) of Title 42 of the United States Code grants federal courts authority to conduct judicial review of final decisions of the Commissioner and "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision . . . with or without remanding the case for a rehearing."  Judicial review of the Commissioner's denial of benefits is limited to whether substantial evidence in the record supports the factual findings and whether the Commissioner applied the correct legal standards.  *Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir. 2007); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); 42 U.S.C. § 405(g).  And, when the Appeals Council has accepted new evidence and made it part of the record, any judicial review must consider the new evidence when evaluating whether substantial

---

[129]*Id.*

[130]Tr. at 40.

[131]Tr. at 41.

[132]Tr. at 41-42.

evidence supports the decision of the Commissioner.  *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th

Cir. 1994); *Mosher v. Astrue*, 479 F. Supp. 2d 1196, 1202 (D. Kan. 2007) (adopting recommend-

ation of Mag. J.).

 "Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" but it must be "more than a scintilla," although it need not be a

preponderance.  *Lax*, 489 F.3d at 1084 (citations and internal quotation marks omitted).  While

the courts "consider whether the ALJ followed the specific rules of law that must be followed in

weighing particular types of evidence in disability cases," they neither reweigh the evidence nor

substitute their judgment for the Commissioner's.  *Id.* (citation and internal quotation marks

omitted).  But they also do not accept "the findings of the Commissioner" mechanically or affirm

those findings "by isolating facts and labeling them substantial evidence, as the court[s] must

scrutinize the entire record in determining whether the Commissioner's conclusions are

rational."  *Alfrey v. Astrue*, 904 F. Supp. 2d 1165, 1167 (D. Kan. 2012).  When determining

whether substantial evidence supports the Commissioner's decision, the courts "examine the

record as a whole, including whatever in the record fairly detracts from the weight of the

Commissioner's decision."  *Id.*  "Evidence is not substantial if it is overwhelmed by other

evidence, particularly certain types of evidence (e.g., that offered by treating physicians) or if it

really constitutes not evidence but mere conclusion."  *Lawton v. Barnhart*, 121 F. App'x 364,

366 (10th Cir. 2005) (quoting *Frey v. Bowen,* 816 F.2d 508, 512 (10th Cir. 1987)).

 A "failure to apply the proper legal standard may be sufficient grounds for reversal inde-

pendent of the substantial evidence analysis."  *Brown ex rel. Brown v. Comm'r of Soc. Sec.*, 311

F. Supp. 2d 1151, 1155 (D. Kan. 2004) (citing *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.

1994)).  But such failure justifies reversal only in "appropriate circumstances" – applying an

improper legal standard does not require reversal in all cases.  *Glass*, 43 F.3d at 1395; *accord*

*Lee v. Colvin*, No. 12-2259-SAC, 2013 WL 4549211, at *5 (D. Kan. Aug. 28, 2013) (discussing

the general rule set out in *Glass*).  Some errors are harmless and require no remand or further

consideration.  *See, e.g.*, *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161-63 (10th Cir. 2012);

*Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004); *Allen v. Barnhart*, 357 F.3d 1140, 1145

(10th Cir. 2004).

**B.  Disability Determination**

Claimants seeking social security disability benefits carry the burden to show that they

are disabled.  *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009).  In general,[133] the Social

Security Act defines "disability" as "the inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Commissioner follows "a five-step sequential evaluation process to determine disa-

bility."  *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (discussing 20 C.F.R. § 404.1520 (govern-

ing claims for disability insurance benefits) and § 416.920 (governing claims for supplemental

security income)).  As summarized by the Tenth Circuit, this familiar five-step process is as

follows:

> Step one requires the agency to determine whether a claimant is "presently
> engaged in substantial gainful activity."  If not, the agency proceeds to consider,
> at step two, whether a claimant has "a medically severe impairment or

---

[133]The definition differs for minors and some blind individuals.  *See* 42 U.S.C. §§ 423(d)(1)(B) (definition for some blind individuals); 1382c(a)(3)(C)(i) (definition for individuals "under the age of 18").

impairments." . . . At step three, the ALJ considers whether a claimant's medically severe impairments are equivalent to a condition "listed in the appendix of the relevant disability regulation."  If a claimant's impairments are not equivalent to a listed impairment, the ALJ must consider, at step four, whether a claimant's impairments prevent [him or] her from performing [his or] her past relevant work.  Even if a claimant is so impaired, the agency considers, at step five, whether [he or] she possesses the sufficient residual functional capability to perform other work in the national economy.

*Wall*, 561 F.3d at 1052 (citations omitted); *accord* 20 C.F.R. § 404.1520(b)-(g).  The claimant

has the "burden of proof on the first four steps," but the burden shifts to the Commissioner "at

step five to show that claimant retained the RFC to 'perform an alternative work activity and that

this specific type of job exists in the national economy.'"  *Smith v. Barnhart*, 61 F. App'x 647,

648 (10th Cir. 2003) (quoting *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)).  This

analysis terminates if the Commissioner determines at any point that the claimant is or is not

disabled.  *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

## V.  ISSUES FOR REVIEW

Plaintiff claims that the ALJ improperly considered the opinions of his treating physician,

Dr. Nichols, and Social Worker Bloch.

## A.  <u>Medical Source Opinions</u>

Under the applicable regulations, the ALJ must consider and weigh all medical opinions.

*See* 20 C.F.R. § 404.1527(b)-(c) (stating that "we will always consider the medical opinions in

your case record together with the rest of the relevant evidence we receive" and "[r]egardless of

its source, we will evaluate every medical opinion we receive").  As the regulation explains to

claimants:  "Medical opinions are statements from physicians and psychologists or other accept-

able medical sources that reflect judgments about the nature and severity of your impairment(s),

including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s),

and your physical or mental restrictions."[134]  *Id.* § 404.1527(a)(2).

The regulations identify three types of "acceptable medical sources":  (1) treating sources, *i.e.*, medical sources who have treated or evaluated the claimant or have had "an ongoing treatment relationship" with the claimant; (2) nontreating sources, *i.e.*, medical sources who have examined the claimant but lack an ongoing treatment relationship; and (3) nonexamining sources, *i.e.*, medical sources who render an opinion without examining the claimant.  *See id.* § 404.1502; *Pratt v. Astrue*, 803 F. Supp. 2d 1277, 1282 n.2 (D. Kan. 2011).  In general, the Commissioner gives more weight to opinions from examining sources than to opinions from nonexamining sources.  20 C.F.R. § 404.1527(c)(1).  And the Commissioner generally gives more weight to treating sources because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Id.* § 404.1527(c)(2).

The Commissioner, moreover, will give a medical opinion of a treating source controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  *Id.*

---

[134]This regulation reserves some issues to the Commissioner "because they are administrative findings that are dispositive of a case" – opinions on such issues do not constitute medical opinions under the regulations.  20 C.F.R. § 404.1527(d).  And "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance."  Policy Interpretation Ruling Titles II & XVI:  Medical Source Opinions on Issues Reserved to the Commissioner, SSR 96-5P, 1996 WL 374183, at *2 (S.S.A. July 2, 1996).  But such opinions "must never be ignored" and, when "evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors" set out in the regulations, 20 C.F.R. §§ 404.1527(c), 416.927(c).  *Id.* at *3.

ALJs must consider these two factors when they determine whether a treating physician's medical opinion "is conclusive, *i.e.*, is to be accorded 'controlling weight,' on the matter to which it relates." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). ALJs first consider whether such an opinion is well-supported. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). If it has adequate support, the ALJ must "confirm that the opinion is consistent with other substantial evidence in the record." *Id.* And ALJs must state "specific, legitimate reasons" for declining to give controlling weight to a treating physician's opinion. *Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009).

The ALJ's inquiry does not end with determining that a medical opinion does not deserve controlling weight. *See Krauser*, 638 F.3d at 1330; *Watkins*, 350 F.3d at 1300.

> Even if a treating opinion is not given controlling weight, it is still entitled to deference; at the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned.

*Krauser*, 638 F.3d at 1330; *accord Watkins*, 350 F.3d at 1300-01. Unless the ALJ gives "a treating source's opinion controlling weight," the ALJ must consider the six specific factors set out in 20 C.F.R. § 404.1527(c)(1)-(6): (1) the examining relationship; (2) the treatment relationship, including the duration of the relationship, the frequency of examination by the physician, and the nature and extent of the relationship; (3) support for the physician's opinions in the medical evidence of record; (4) consistency of the opinions with the record as a whole; (5) the specialization of the treating physician; and (6) any other factors brought to the ALJ's attention. *Krauser*, 638 F.3d at 1331; *Watkins*, 350 F.3d at 1301; *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).

"After considering the pertinent factors, the ALJ must 'give good reasons in [the] notice of determination or decision' for the weight he ultimately assigns [to] the opinion" of a treating physician.  *Watkins*, 350 F.3d at 1301 (citation and internal quotation marks omitted); *accord* 20 C.F.R. § 404.1527(c)(2).  There is no requirement, however, that the ALJ conduct "a factor-by-factor analysis so long as the ALJ's decision [is] sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (citation and internal quotation marks omitted).  When an ALJ completely rejects an opinion of a treating source, the ALJ must state specific and legitimate reasons for the decision.  *Watkins*, 350 F.3d at 1301.

In the absence of good cause shown, an ALJ must give substantial weight to a treating physician's opinion.  *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995).  "When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around."  *Id.* at 290 (citation and internal quotation marks and alterations omitted).

A reviewing court may reverse and remand a social security case when the ALJ has failed to apply the correct legal standards in weighing the opinion of a treating physician.  *Id.* at 289.  When an ALJ merely finds that an opinion from a treating physician is not entitled to controlling weight but fails to state clearly how much weight is given to the medical opinion with good reasons for the weight assigned, "remand is required."  *Krauser*, 638 F.3d at 1330.  But in other circumstances, a failure to address properly and weigh all opinions is subject to a harmless error

25

analysis. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161-63 (10th Cir. 2012). "When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004). Consequently, absent inconsistencies between or among the medical opinions and the ALJ's RFC determination, any error in considering the opinions is harmless. *Keyes-Zachary*, 695 F.3d at 1161-62. And, where inconsistencies exist, the courts may

> supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, *i.e.*, where, based on material the ALJ did at least consider (just not properly), [the court] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.

*Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

Here, the ALJ considered the opinions of plaintiff's treating physician, Dr. Nichols. While noting that opinions about the issue of disability are reserved to the Commissioner, the ALJ gave Dr. Nichols' opinions "some weight" to the extent they supported the finding that plaintiff has non-exertional limitations. Otherwise, the ALJ gave them "little weight" without expressly considering whether they are well-supported or consistent with other substantial evidence. Nor did the ALJ expressly consider the required six factors. Although the ALJ recognizes Dr. Nichols as plaintiff's treating physician, the ALJ does not recognize him specifically as an examining source who treated plaintiff from October 2010 through March 2012.[135] Nor did the ALJ discuss the nature and extent of the treatment relationship between plaintiff and Dr. Nichols. And rather than discussing the supportability of the opinions, consistency with the

---

[135]Circumstances beyond the ALJ's control created some of these shortcomings. For example, the treatment notes dated between September 2011 and March 2012 were not submitted for consideration until this case reached the Appeals Council.

record as a whole, or lack thereof, the ALJ focused on small portions of the opinions or treatment record to note perceived inconsistencies.  The ALJ discounts the GAF score of 35 (without noting the range of 30 to 40) because the treatment notes of Dr. Nichols do not include a GAF score and provide little information about plaintiff's condition or progress.  Similarly, the ALJ discounts the doctor's questionnaire answers because Dr. Nichols had noted that:  (1) in December 2010 plaintiff "felt better and . . . no longer needed Seroquel"; (2) in March 2011 plaintiff was "doing great" and was "at the top of [his] game"; and (3) in May 2011 plaintiff was "doing well."

Appropriately, plaintiff argues that the ALJ improperly considered Dr. Nichols' opinions. The ALJ essentially bypassed the two-step process for determining whether Dr. Nichols' medical opinions are entitled to controlling weight.  Nevertheless, by giving the opinions some or little weight, he clearly determined that controlling weight was unwarranted.  But he provided no good reason for the weight assigned.  He instead pointed to portions of Dr. Nichols' records to perceive inconsistencies that appear out of context or absent when viewing the record as a whole.  And statements such as "doing great," "doing well," and even "top of [his] game," are relative and provide little support without considering the comprehensive medical record.  They also are inherently ambiguous because they could mean "doing well for a person with severe mental impairments" or, instead, "doing well in a general sense."

More specifically, although Dr. Nichols' records indeed show that plaintiff was doing great in March 2011, the ALJ fails to mention plaintiff's April 2011 suicide attempt.  And while the ALJ states that the records show that plaintiff was "doing well" in May 2011, that record actually states that plaintiff was "[d]oing pretty well" followed by a notation of "medication

daily."  Moreover, appropriate consideration of the March and May statements necessarily requires express consideration of the intervening suicide attempt in April; otherwise the ALJ is not viewing the record as a whole.  Additionally, although Dr. Nichols stopped prescribing one medication – Seroquel – the ALJ did not note that he continued to prescribe other medications for plaintiff's conditions during that same period.  These perceived inconsistencies do not provide good reasons for the weight assigned to Dr. Nichols' opinions.  Nor do they provide substantial evidence to support the assigned weight.

While the ALJ accurately states that the treatment records of Dr. Nichols provide little information on plaintiff's condition and progress, the ALJ did not have the benefit of later records that provided greater detail.  Records from September 2011 through March 2012 were first submitted to and accepted by the Appeals Council, which found no reason to review the ALJ's decision.  These later records, however, place Dr. Nichols' opinions of October 19, 2011, in a different light.  Because the ALJ had no opportunity to review these material treatment records, his statement about the treatment records before him does not provide good reason to discount the October 2011 opinions.  And the statement does not provide substantial evidence to support discounting them.  Absent the later records, the October opinions are out of context and appear less consistent with the treatment records as a whole.

Likewise, and though the ALJ accurately states that Dr. Nichols' contemporaneous treatment notes reflect no GAF score and that, meanwhile, in May 2010, Bloch noted a GAF score consistent with the score that Dr. Mintz assessed in July 2010, a GAF score is not crucial to a medical opinion and will not alone "establish an impairment serious enough to preclude an ability to work."  *Holcomb v. Astrue*, 389 F. App'x 757, 759 (10th Cir. 2010).  The absence of such a

score in treatment records does not make those records inconsistent with a later opinion that
includes a GAF assessment.  When assessed, GAF scores are merely part of the evidence that
ALJs must consider with the entirety of the record.  They represent a clinician's assessment of "a
person's psychological, social, and occupational functioning" based upon the totality of informa-
tion before the clinician.  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).
While assessed scores are considered in the social security context, *see id.* at 1164, the informa-
tion underlying the assessment is more pertinent than the actual score.  And as stated in the pre-
vious paragraph, Dr. Nichols' treatment records between September 2011 and March 2012 were
not before the ALJ and they provide a better context for differences between the October 2011
GAF score calculated by Dr. Nichols and the 2010 scores calculated by Bloch and Dr. Mintz.
Also, the ALJ does not recognize that Bloch initially had assessed plaintiff's GAF score at 44,
which puts it closer to the 30 to 40 range assessed by Dr. Nichols.  Nor does he recognize the
"20" assigned to plaintiff's Axis V diagnostic impression on August 21, 2010.  Accordingly, the
Court finds no substantial evidence to support this proffered reason for discounting the weight
given to Dr. Nichols' opinions.

Furthermore, the ALJ appropriately notes that when Dr. Nichols opined that plaintiff is
disabled or unable to work, the doctor encroached on issues reserved for the Commissioner.  *See*
20 C.F.R. § 404.1527(d) (reserving to the Commissioner the decision to determine (1) whether
claimant is disabled and (2) the claimant's RFC and whether the impairments meet or equal a
listing); *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994)
(holding that such opinions are "not dispositive because final responsibility for determining the
ultimate issue of disability is reserved to the [Commissioner]").  Still, the ALJ must consider the

opinion and the regulatory factors set out in 20 C.F.R. § 404.1527(c). *See* Policy Interpretation

Ruling Titles II & XVI: Medical Source Opinions on Issues Reserved to the Commissioner,

SSR 96-5P, 1996 WL 374183, at *3 (S.S.A. July 2, 1996). Even though the ALJ recognized the

opinion of disability, he failed to consider the regulatory factors.

The ALJ also accorded more weight to the opinions of a nonexamining source (Dr.

Cohen) and a nontreating source (Dr. Mintz) than he did to the opinions of plaintiff's treating

physician (Dr. Nichols). The ALJ gave Dr. Cohen's opinions great weight because she had the

opportunity to review plaintiff's entire file. But this reasoning appears facially unacceptable

because the governing regulation provides that opinions of reviewing physicians are generally

accorded less weight than opinions of an examining source and that treating sources are

generally entitled to the most weight. *See* 20 C.F.R. § 404.1527(c)(1) and (2). Moreover, Dr.

Cohen did not have the benefit of the records about plaintiff's August 2010 suicide attempt, the

records from Bloch following that attempt, or the later opinions from Dr. Nichols that the ALJ

specifically discounted. Consequently, as a factual matter, Dr. Cohen did not review plaintiff's

entire file that was before the ALJ. The ALJ has not provided a good reason for giving more

weight to the opinions of Dr. Cohen than to plaintiff's treating physician.

The ALJ also gave significant weight to opinions of Dr. Mintz, which the ALJ described

as "generally consistent with the record as a whole" and supported by medically acceptable clini-

cal techniques or testing. Because Dr. Mintz did not have an ongoing treatment relationship with

plaintiff, his opinions are generally given less weight than opinions of a treating physician. By

giving Dr. Mintz' opinions more weight, the ALJ appeared to question the consistency and sup-

portability of Dr. Nichols' opinions, albeit implicitly. But even if that was appropriate, the ALJ

still must weigh the medical opinions of Dr. Nichols with appropriate deference and state good reasons for the weight given.  As already discussed, the ALJ did not do this adequately.

For all of these reasons, the Court concludes that ALJ has failed to provide good reasons for the weight assigned to the opinions of Dr. Nichols.  The proffered reasons do not constitute substantial evidence to support the weight assigned to the opinions.

In addition, the Court believes other matters detract from the soundness of the ALJ's decision.  For instance, when discussing the August 2010 suicide attempt, the ALJ erroneously attributed an initial assessment to the presiding physician (Dr. Gard) rather than the social worker who made the assessment.  Relatedly, the ALJ gave little weight to opinions of Social Worker Bloch even though he used Bloch's progress reports without identifying the source to bolster the finding that plaintiff improved after the suicide attempt.  Although the next section addresses the weight given to Bloch's opinions, it is inconsistent for an ALJ to use certain opinions as support for his decision while simultaneously giving "little weight" to the same opinions.  *See Quintero v. Colvin*, No. 13-1396, 2014 WL 2523705, at *4 (10th Cir. June 5, 2014).

The regulations require ALJs to "consider all evidence in [the] case record when [they] make a determination or decision whether [a claimant is] disabled."  20 C.F.R. § 404.1520(a)(3).  "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."  *Clifton v. Chater*, 79 F.3d 1007, 1009-1010 (10th Cir. 1996).  However, the ALJ generally "must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Id.* at 1010.  ALJs may not "pick and choose among medical reports, using portions of evidence favorable to [their] posi-

tion while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004); *accord Keyes-Zachary*, 695 F.3d at 1166; *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (per curiam decision applying same principle to medical opinions without the qualifier "uncontradicted" used in other Tenth Circuit opinions).  Nor may they "pick and choose which aspects of an uncontradicted medical opinion to believe, relying on only those parts favorable to a finding of nondisability." *Hamlin v. Barnhart*, 365 F.3d 1208, 1219 (10th Cir. 2004); *accord Chapo v. Astrue*, 682 F.3d 1285, 1292 (10th Cir. 2012); *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007).  When opinions are not uncontradicted entirely, the ALJ must provide a valid reason for choosing one opinion over another to the extent the opinions differ.  *Quintero*, 2014 WL 2523705, at *4.  In other words, "to the extent there are differences of opinion among the medical sources, the ALJ must explain the basis for adopting one and rejecting another, with reference to the factors governing the evaluation of medical-source opinions." *Reveteriano v. Astrue*, 490 F. App'x 945, 947 (10th Cir. 2012).

The ALJ in this case failed to provide any valid reason for choosing to give more weight to the opinions of state agency consultants than the ALJ gave to plaintiff's treating physician.  Instead, the ALJ selectively picked and chose portions of the record to note perceived inconsistencies when he stated his reasons for giving "little weight" to opinions of Dr. Nichols.  The decision of the ALJ does not reflect consideration of the entire medical record.  And substantial evidence does not support the stated reasons for assigning the weight given to Dr. Nichols' opinions.

For all of these reasons, the ALJ improperly considered the opinions of plaintiff's treating physician.

**B.  Other Source Opinions**

In addition to evidence from acceptable medical sources, such as licensed physicians and psychologists, the Commissioner "may also use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [his or her] ability to work."  20 C.F.R. § 404.1513(d).  In 2006, the Social Security Administration recognized "the growth of managed health care" and the increasing role of non-acceptable medical sources, "such as nurse practition-ers, physician assistants, and licensed clinical social workers," play in treating and evaluating claimants.  *See* Titles II & XVI:  Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disabil-ity by Other Governmental and Nongovernment Agencies, SSR 06-03P, 2006 WL 2329939, at *3 (S.S.A. Aug. 9, 2006).  It thus issued SSR 06-03P to clarify how ALJs "consider opinions and other evidence from medical sources who are not 'acceptable medical sources' and from 'non-medical sources.'"  *Id.* at *4.

"The distinction between 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources' is necessary for three reasons":  (1) evidence from an acceptable medical source is required to establish the existence of a medically determinable impairment; (2) medical opinions only come from acceptable medical sources; and (3) only such sources can be considered treating sources whose medical opinions may be entitled to controlling weight.  *Id.* at *2.  Distinguishing between acceptable and other sources facilitates application of the regulations establishing an impairment's existence, evaluating medical opinions, and determining who qualifies as a treating source.  *Id.*

Licensed clinical social workers do not qualify as an acceptable medical source, even

though they are medical sources.  *See id.*  But, although "these 'other sources' cannot establish

the existence of a medically determinable impairment," which requires "evidence from an

'acceptable medical source,'" other sources "may provide insight into the severity of the impair-

ment(s) and how it affects the individual's ability to function."  *Id.*  And, while the regulations

"do not explicitly address how to consider relevant opinions and other evidence from 'other

sources,'" such opinions and evidence "are important and should be evaluated on key issues such

as impairment severity and functional effects, along with the other relevant evidence in the file."

*Id.* at *3.  By requiring ALJs to consider other factors brought to their attention, the regulations

require consideration of evidence and opinions from other sources.  *Id.* at *4 (citing 20 C.F.R. §§

404.1527, 416.927).

When considering opinion evidence from other sources, ALJs must use the same factors

used to weigh the opinions from acceptable medical sources.  *Id.* at *4-5.  Of course, not every

factor applies in every case and the particular facts of the case affects the evaluation of opinions

from non-acceptable medical sources.  *Id.* at *5.  With respect to weighing such opinions, SSR

06-03P states:

> The fact that a medical opinion is from an "acceptable medical source" is a factor
> that may justify giving that opinion greater weight than an opinion from a medical
> source who is not an "acceptable medical source" because, as . . . previously
> indicated in the preamble to [the] regulations at 65 FR 34955, dated June 1, 2000,
> "acceptable medical sources" "are the most qualified health care professionals."
> However, depending on the particular facts in a case, and after applying the
> factors for weighing opinion evidence, an opinion from a medical source who is
> not an "acceptable medical source" may outweigh the opinion of an "acceptable
> medical source," including the medical opinion of a treating source.  For example,
> it may be appropriate to give more weight to the opinion of a medical source who
> is not an "acceptable medical source" if he or she has seen the individual more
> often than the treating source and has provided better supporting evidence and a
> better explanation for his or her opinion.  Giving more weight to the opinion from
> a medical source who is not an "acceptable medical source" than to the opinion

34

from a treating source does not conflict with the treating source rules . . ..

*Id.*

Because ALJs must consider all relevant evidence in a case record, they must consider all opinions from all medical sources – acceptable or not.  *Id.* at *6.  And SSR 06-03P explains the consideration given to opinions from "other sources."  *Id.*  It provides:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.  In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable.

*Id.*

In this case, the ALJ appears to have recognized that opinions taken from Social Worker Bloch's treatment records cannot establish an impairment because the applicable regulation, 20 C.F.R. § 404.1513, requires such opinions to be rendered by an acceptable medical source.  *See* Tr. at 37.  And while the ALJ notes that information from a social worker "might help in under-standing how an impairment affects an individual's ability to work," the ALJ then states that he "must rely on the opinions of the treating and consulting medical specialists who examined the claimant."  *See id.*  The ALJ concluded his brief consideration of Bloch's opinions by noting that "opinions as to disability are reserved for the Commissioner" and thus giving "little weight" to Bloch's opinions.  *Id.*  Although the ALJ's decision reflects that he considered Bloch's opinions, the ALJ did not consider the required factors when he weighed the opinions.  As was the case in

*Crowder v. Colvin*, No. 13-1222, 2014 WL 1388164, at *4-5 (10th Cir. Apr. 10, 2014), it instead appears "that the primary (and perhaps overriding) factor for the ALJ was that [the social worker] was not an 'acceptable medical source.'" ALJs, however, are not entitled to disregard opinions merely because the medical source is not an acceptable one. *Carpenter v. Astrue,* 537 F.3d 1264, 1268 (10th Cir. 2008). It was error for the ALJ to weigh opinions of a licensed clinical social worker in this fashion. *See Crowder*, 2014 WL 1388164, at *4-5.

## C. <u>Harmless Error</u>

The ALJ has erred in his consideration of Dr. Nichols' opinions and Social Worker Bloch. And he has failed to state any valid reason for the weight he assigned to those opinions. His stated reasons, furthermore, do not constitute substantial evidence for discounting the opinions. The need for express analysis is not weakened in this case by an absence of any need to reject or weigh these opinions unfavorably to determine plaintiff's RFC. Material inconsistencies exist between the opinions of Bloch and Dr. Nichols, on one side, and the consultant opinions relied upon by the ALJ on the other side. The Court cannot state confidently that no reasonable administrative factfinder could have found more severe mental limitations by weighing the opinions under the proper legal standard. Had the ALJ given greater weight to the opinions of Bloch and Dr. Nichols, the ALJ could have found more severe mental limitations that could have altered his other findings.

On judicial review, this Court does not supply "possible reasons for rejecting a physician's [or other medical source's] opinion in order to affirm," *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008), unless exceptional circumstances justify finding the error harmless, *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). For the reasons stated, the Court can-

not conclude that the ALJ's errors were harmless.  Accordingly, the Court remands this action

for the ALJ to weigh the opinions of Bloch and Dr. Nichols properly.  The Court expresses no

opinion about the weight to be given any opinion or the ultimate determination as to whether

plaintiff is disabled and entitled to benefits.  These matters are for the ALJ to determine on

remand.  It is not the role of this Court to supply a "post hoc rationale . . . because it usurps the

agency's function of weighing and balancing the evidence in the first instance."  *Carpenter*, 537

F.3d at 1267.

## VI.  CONCLUSION

For the reasons explained above, the Court directs that judgment shall be entered in

accordance with the fourth sentence of 42 U.S.C. § 405(g) reversing the Commissioner's deci-

sion and remanding the case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

**Dated in Topeka, Kansas on this 22nd day of July, 2014.**


**S/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**